JEG:PNK:SK
F.#2010R01452

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

**M-10-1088**

- - - - - - - - - - - - - - - - - - - X

IN THE MATTER OF THE SEARCH OF THE
PREMISES DESCRIBED AS COLON AND RECTAL
CARE OF NY, P.C., 2955 BRIGHTON 4TH
STREET, BROOKLYN, NEW YORK, FIRST FLOOR,
RIGHT HAND ENTRANCE, WITH A SIGN ABOVE
THE DOOR STATING, "PROCTOLOGY CLINIC
718-236-4040"

SEALED AFFIDAVIT IN
SUPPORT OF SEARCH
WARRANT

- - - - - - - - - - - - - - - - - - - X

EASTERN DISTRICT OF NEW YORK, SS:

Ronny Aguilar, being duly sworn, deposes and says:

1. I am a Special Agent with the Department of Health
and Human Services, Office of the Inspector General ("HHS-OIG")
and am currently assigned to investigate health care fraud
violations, including schemes to defraud the Medicare program and
other health care benefit programs. Among other duties, I am now
participating in an investigation relating to allegations of
violations and attempted violations of, and conspiracies to
violate, <u>inter alia</u>, Title 18, United States Code, Section 1347
(Health Care Fraud); Title 18, United States Code, Section 1349
(Health Care Fraud Conspiracy); and Title 18, United States Code,
Section 1028A (Aggravated Identity Theft)(collectively the
"Specified Federal Offenses"), by Dr. Boris Sachakov ("Boris
Sachakov"), Michael Sachakov, and others known and unknown.

2.     I have been an HHS-OIG Special Agent for approximately four years.  During my tenure with HHS-OIG, I have participated in a variety of criminal health care fraud investigations involving schemes to defraud Medicare, including schemes to bill for unnecessary treatment or services that were not provided.  Some of these schemes have involved kickbacks to patients who, in exchange for money, agree to undergo unnecessary treatment or who agree to remain silent about bills to Medicare for services that were not provided.  During the course of these investigations, I have conducted physical surveillance; reviewed Medicare claims data, bank records, and other business records; and employed other investigative techniques.  I am familiar with the records and documents maintained by health care providers, and I am familiar with the laws and regulations related to the administration of the Medicare program and other health care benefit programs.

3.     Currently, I am assigned to one of the Medicare Fraud Strike Force ("Strike Force") teams, which is staffed with law enforcement agents and officers from the HHS-OIG and the Federal Bureau of Investigation, as well as state and local investigators from the New York State Office of the Attorney General, Medicaid Fraud Control Unit, the New York City Police Department, and the New York City Human Resources Administration.

The Strike Force is tasked with investigating criminal health care fraud cases involving the Medicare and Medicaid programs.

4.   This affidavit is submitted in support of the application for a warrant to search the business known as Colon and Rectal Care of NY, P.C. ("CRCNY"), which is located at 2955 BRIGHTON 4TH STREET, BROOKLYN, NEW YORK (the "SUBJECT PREMISES"). Based on the facts set forth in this Affidavit, I respectfully submit that there is probable cause to believe that there is presently located in the SUBJECT PREMISES records, files, correspondence, memoranda, a computer or computers, computer drive/disks, bank and other financial records, data, and other materials, all of which constitute evidence, fruits and instrumentalities of violations and attempted violations of, and conspiracies to violate, inter alia, the Specified Federal Offenses.

5.   I have personally participated in the investigation of the Specified Federal Offenses referred to above, and am familiar with the relevant facts and circumstances. The information contained in this Affidavit is based on my own observations and on discussions I have had with other law enforcement personnel.  Because this Affidavit is being submitted for the limited purpose of obtaining a search warrant, I have not set forth each and every fact learned during the course of this investigation, but simply those facts that I believe are

necessary to establish probable cause to support the issuance of a search warrant of the SUBJECT PREMISES.  Except where otherwise noted, all conversations described in this Affidavit are set forth in part and in substance only.

## THE SUBJECT PREMISES

6.    The SUBJECT PREMISES is located between Brighton 4th Lane and Oceanview Avenue in Brooklyn, New York.  The SUBJECT PREMISES is located between 2949 and 2959 Brighton 4th Street. The SUBJECT PREMISES is a five story tan building, with off white trim and a stucco surface.  On the left corner of the building is a solid metal silver colored roll down garage door with a red and white colored "No Parking" sign affixed above the door.  The second thru fifth floors appear to be residential with two balconies for the third floor, two balconies for the fourth floor and two penthouse apartments on the fifth floor.  The ground floor entrances are comprised of three pairs of glass doors with large glass windows on the left and right of the doors.  The center pair of glass doors has "2955" in black and white color affixed to one of the doors.  To the right of these doors, mounted on the door frame, is a bell intercom access box.  This intercom box lists fourteen apartments, listed as 2A thru 15B. Upon entry through the center pair of doors is lobby access to the above apartments with mail boxes located to the right, an elevator located in the center and two set of stairs located at

lettering that reads "Medical Office."  Upon entering the pair of glass doors on the left is a much smaller area than previously described with approximately three chairs.  There is a desk that is fully enclosed with a window and a closed glass door towards the right.  Numerous file folders are along the left wall, beginning from behind the desk enclosure and continuing back. There are no side or rear access to the SUBJECT PREMISES.

## BACKGROUND

### The Health Care Benefit Programs

7.   Medicare, 1199SEIU Benefit and Pension Funds ("1199SEIU"), Aetna, EmblemHealth (including GHI and HIP) ("Emblem"), The Empire Plan ("Empire"), Fidelis Care ("Fidelis"), Humana, Oxford Health Plans ("Oxford"), UnitedHealth Group ("United"), and Wellpoint, Inc. ("Wellpoint") (collectively, the "Benefit Programs") are public and private health insurance plans, affecting commerce, under which medical benefits, items, and services were provided to individuals.

8.   Each of the Benefit Programs is a "health care benefit program" as defined by Title 18, United States Code, Section 24(b).

9.   The Benefit Programs compensate medical service providers for medical services that they actually rendered and are medically necessary.

7

10.   To receive reimbursement from the Benefit Programs, medical service providers submit or cause the submission of claims, either electronically or in writing, to the Benefit Programs for payment of services, either directly or through a billing company.

Proctological Services Covered by the Benefit Programs

11.   The Benefit Programs cover the costs of proctological services including the treatment of hemorrhoids, office visits, anoscopies, proctosigmoidoscopies, hemorrhoidectomies, and the destruction of anal lesions.

12.   Hemorrhoids are swollen veins in the anal canal. The anal canal is approximately last 2 inches of the colon. Veins swelling inside the anal canal form internal hemorrhoids. Veins swelling near the opening of the anus form external hemorrhoids.

13.   An office visit, otherwise referred to as an evaluation and management service, includes services related to taking a patient history, conducting an examination, and/or determining the appropriate course of medical treatment.

14.   An anoscopy is an examination of the anal canal using a short, rigid, hollow tube (anoscope) that may contain a light source.

15.  A proctosigmoidoscopy is an examination of the rectum and sigmoid colon (which is approximately the last 10 inches of the colon) using a flexible or rigid lighted tube (sigmoidoscope).  The proctosigmoidoscopy may involve, among things, dilation (or the expansion) of the colon with a baloon or guide wire, and the control of bleeding, usually by cauterization.  These more involved proctosigmoidoscopies may require moderate (conscious) sedation which is typically administered intravenously.  In preparation for a proctosigmoidoscopy, the patient may be instructed to follow a liquid diet for a day or two before the procedure or fast for up to 12 hours before the test.

16.  Hemorrhoidectomies, or the removal of hemorrhoids, may be performed different ways, including through:  (1) rubber band ligation, the tying off of a hemorrhoid at its base with rubber bands cutting off the blood flow to the hemorrhoid, causing it to shrink, die, and fall off in about a week; (2) excision, the surgical removal by cutting of the hemorrhoid; and (3) destruction of the hemorrhoid by thermal energy, such as infrared heat.

17.  The destruction of anal lesions (or abnormalities of tissue found near the anus) is performed by a variety of methods, such as laser surgery, electrosurgery, cryosurgery, or chemosurgery.

18.   The reimbursement amounts that the Benefit Programs pay medical service providers for performing certain surgical procedures, such as hemorrhoidectomies, include payment for medical services that are related to those surgical procedures, such as preoperative and postoperative care.  The surgical procedure and all related medical services are bundled together to form what is referred to as a "global surgical package."  The Benefit Programs provide a single payment for all medical services that are bundled together in the global surgical package for a period of time called the "global period."  For instance, under Medicare, the costs of all post-operative office visits for a hemorrhoidectomy and any surgical or other medical services that are required during the post-operative period because of any complications arising from that hemorrhoidectomy may be not billed separately to Medicare during the global period.

19.   The global period for a hemorrhoidectomy by rubber band ligation is 10 days.  The global period for a hemorrhoidectomy by excision or destruction by thermal energy is 90 days.

20.   A medical service provider may not bill separately for medical services during the global period for a procedure unless such services are wholly unrelated to post-operative care and/or are clearly distinct and independent from the procedure.

FACTS SUPPORTING PROBABLE CAUSE

Colon and Rectal Care of New York, PC

21.   Boris Sachakov is a proctologist who practices at Colon and Rectal Care of New York, PC ("CRCNY"), which does business at the SUBJECT PREMISES.

22.   Michael Sachakov is the office manager for CRCNY and also the brother of Boris Sachakov.

23.   CRCNY was incorporated on or about October 27, 2005, with Boris Sachakov as the registered agent and its sole shareholder, director, and officer.  On or about April 29, 2008, Boris Sachakov signed a "Secretary's Certificate" indicating the he was the sole shareholder of CRCNY and also CRCNY'S President and Secretary.

24.   On or about February 1, 2008, Boris Sachakov signed a lease agreement for the SUBJECT PREMISES between BOSA Properties, LLC ("BOSA") and CRCNY.  BOSA was incorporated on or about November 9, 2007, upon the filing of Articles of Organization signed by Boris Sachakov as the Secretary.  Boris Sachakov signed the lease agreement between BOSA and CRCNY for both the owner (BOSA) and the tenant (CRCNY).

25.   Between approximately October 27, 2005 and August 13, 2008, Boris Sachakov submitted applications to Medicare seeking authorization to submit reimbursement claims to Medicare through CRCNY.  By signing these applications, Boris Sachakov

11

certified that he would abide by all Medicare rules, regulations, and program instructions.

26. On or about September 26, 2008, Boris Sachakov signed an Electronic Funds Transfer (EFT) Authorization Agreement that authorized Medicare to deposit by EFT reimbursement payments for claims submitted by Boris Sachakov into HSBC account XXXXX6490. On May 9, 2007, Boris Sachakov signed an EFT Authorization Agreement that authorized Medicare to deposit reimbursement payments by EFT for claims submitted by Boris Sachakov into Washington Mutual account XXXXXX2000. Boris Sachakov is the sole signatory for HSBC account XXXXX6490 and Washington Mutual account XXXXXX2000.

## Initiation of the Investigation into the Defendant

27. Several of the Benefit Programs began investigating Boris Sachakov after receiving complaints from patients about Boris Sachakov submitting claims for services that they did not receive and/or based on suspicious billing patterns. For instance, Medicare initiated an investigation based on Boris Sachakov's pattern of billing for multiple hemorrhoidectomies along with office visits and examinations on the same day for the same patient on multiple occasions. In order to bill for multiple office visits, examinations, and hemorrhoidectomies that would otherwise fall within the global period of one

hemorrhoidectomy, Boris Sachakov consistently submitted claims for office visits, examinations, and subsequent hemorrhoidectomies as if he were treating distinct, unrelated conditions, when, in fact, he solely was providing follow up services related to the initial procedure.

## The Fraudulent Scheme

28.   From approximately February 2009 through approximately January 2010, Boris Sachakov submitted voluminous claims to Medicare for five proctological services including three different types of hemorrhoidectomies (by rubber band ligation, excision, and thermal energy) and two different anoscopies.   For those five services in that time period, Boris Sachakov billed Medicare approximately $3,519,670 and was paid by Medicare approximately $2,496,545.   For those same services in the same time period, the next highest medical service provider in the entire United States billed Medicare approximately $247,195 and was paid by Medicare approximately $115,134.   The table below summarizes the top six medical service providers in the United States for the five proctological services described above from approximately February 2009 through January 2010:

| Provider Initials | Provider State | Amount Billed | Amount Paid | Services Billed | Number of Claims |
|---|---|---|---|---|---|
| Boris Sachakov | NY | $3,519,670 | $2,496,545 | 6,593 | 3,962 |
| B.G. | ME | $247,195 | $115,134 | 381 | 380 |
| L.M. | PA | $238,865 | $73,434 | 420 | 395 |
| R.G. | FL | $185,261 | $48,676 | 324 | 318 |
| H.G. | FL | $183,268 | $127,929 | 736 | 735 |
| A.K. | NY | $173,600 | $42,398 | 217 | 217 |

29.  Subsequently, investigators conducted an analysis of the time it would have taken SACHAKOV if he actually performed all of the services for which he billed the Benefit Programs. This time analysis was based on the claims that SACHAKOV submitted to Medicare, 1199SEIU, EmblemHealth, Fidelis, United, and WellPoint for 2009.  For this analysis, each office visit, examination, and surgical procedure was assigned a standardized amounts of time.  The medical director of EmblemHealth, who is also a board certified physician in internal medical, consulted a colo-rectal surgical specialist and asked for the fastest time such colo-rectal surgical procedures could be performed.  Office visits were assigned amounts of time that are established by the American Medical Association and adopted by insurance carriers, including the Benefit Programs, as industry standards, which are based on the history of the patient, the examination of the patient, and how much time it should take a physician to diagnose the patient and arrive at a treatment plan.  Based upon this

14

analysis, each examination (such as an anoscopy or proctosigmoidoscopy) and colo-rectal surgical procedure that was billed by SACHAKOV was deemed to last an average of 15 minutes.

30. Based on this time analysis, in 2009, Boris Sachakov submitted a claim to Medicare, 1199SEIU, EmblemHealth, Fidelis, United, and/or WellPoint on 267 of the 365 days in 2009. Not including holidays, there were 261 weekdays in 2009. In 180 of the 267 days in which Boris Sachakov submitted at least one claim, Boris Sachakov billed for more than 24 hours. In an additional 30 days, Boris Sachakov billed for more than 20 hours.

31. According to a background questionnaire that Boris Sachakov submitted to Medicare on or about October 22, 2009, CRCNY was open for business on Mondays from 9:00 a.m. to 9:00 p.m. (12 hours), on Tuesdays from 9:00 a.m. to 6:00 p.m. (9 hours), on Wednesdays from 9:00 a.m. to 6:00 p.m. (9 hours), on Thursdays from 9:00 a.m. to 9:00 p.m. (12 hours), and on Fridays from 10:00 a.m. to 5:00 p.m. (7 hours). Of the 267 days on which Boris Sachakov submitted at least one claim, Boris Sachakov billed more than 12 hours on 249 days.

32. Based on the applications he submitted, Boris Sachakov is the only medical doctor who practices at CRCNY.

33. During an interview with an Emblem investigator on or about October 26, 2009, Boris Sachakov stated that he performs all of the surgeries and medical procedures. During this

interview, Boris Sachakov further stated that he completed the reimbursement claims (or bills) and that he would complete the patient charts based on what he had billed.

34. The table below summarizes the claims data for six Medicare patients for whom Boris Sachakov purportedly provided the highest number of hemorrhoidectomy procedures, from approximately January 2007 through January 2010, including the approximate number of hemorrhoidectomies, the approximate date range in which those hemorrhoidectomies were purportedly performed, the approximate number of medical services, including hemorrhoidectomies, that Boris Sachakov billed for those patients, and the approximate amount of money that Boris Sachakov billed Medicare for those services:

| Medicare Patient Initials | Number of Hemorrhoidectomies | Date Range (No. of Months) | Total Number of Services | Amount Billed |
|---|---|---|---|---|
| L.K. | 85 | 5/08 to 1/10 (20 months) | 200 | $60,020 |
| Y.S. | 57 | 4/07 to 1/10 (33 months) | 143 | $37,415 |
| K.E. | 54 | 12/07 to 8/09 (21 months) | 113 | $31,040 |
| A.S. | 41 | 8/08 to 12/09 (16 months) | 106 | $37,185 |
| B.B. | 38 | 1/08 to 6/09 (18 months) | 80 | $22,035 |
| L.T. | 38 | 8/08 to 6/09 (10 months) | 95 | $31,675 |

35. On or about October 22, 2009, Medicare investigators conducted an unannounced inspection of CRCNY at the SUBJECT PREMISES. As part of that inspection, Medicare investigators obtained copies of 138 patient charts from CRCNY.

36. Based on a review of those 138 patient charts, Medicare investigators concluded that the reimbursement claims that Boris Sachakov submitted for all 138 patients should have been denied. In every patient chart, the actual documentation of what medical services were purportedly provided did not correspond with the medical services that Boris Sachakov billed Medicare.

37. For instance, Boris Sachakov submitted separate claims for office visits and examination services that should have been bundled together in a global surgical package. In submitting separate claims for office visits, which he unbundled from the global surgical package, Boris Sachakov falsely stated that the office visits: (1) took place within the post-operative global period for a procedure but were for a reason or reasons that were unrelated to the original procedure; and/or (2) took place on the same day as a certain procedure but were for a separate, identifiable evaluation and management that is above and beyond the usual pre- and post-operative work of the procedure. In separate claims for examination services, such as anoscopies and proctosigmoidoscopies, which he unbundled from the

40.   In all 138 patient charts, however, there was insufficient documentation to support the separate claims for the multiple hemorrhoidectomies.

41.   Aside from Medicare, all of the other Benefit Programs received claims from Boris Sachakov from that followed the same billing pattern, i.e., claims for office visits, examinations, and hemorrhoidectomies for the same patient on the same day, where such medical services, which would otherwise be covered in a global period, are described as being separate unrelated and/or distinct services.   For at least one of the Benefit Programs, this billing pattern began as early as April 2003 and lasted through at least May 2010, and for another Benefit Program has continued through at least August 2010.

42.   As part of this investigation, law enforcement officials conducted interviews of patients who submitted complaints to the Benefit Programs about Boris Sachakov.

Patient E.Y.

43.   SACHAKOV submitted a reimbursement claim for patient E.Y. indicating that, on April 22, 2008, SACHAKOV conducted an office visit, a proctosigmoidoscopy, and a hemorrhoidectomy for E.Y., who was then covered by Emblem. SACHAKOV billed Emblem for an office visit which SACHAKOV claimed involved taking a comprehensive history, conducting a

comprehensive examination, and involving a highly complex medical decision or decisions that took about 80 minutes.  SACHAKOV billed Emblem for a purported proctosigmoidoscopy involving moderate (conscious) sedation.  SACHAKOV billed Emblem for a purported hemorrhoidectomy involving the excision of an internal or external hemorrhoid.  If they occurred, the office visit and the proctosigmoidoscopy, should have been covered in the global surgical package for the hemorrhoidectomy.  However, in order to bill for the office visit separately, SACHAKOV indicated that the office visit was for a significant, separately identifiable office visit that was above and beyond what was necessary for the hemorrhoidectomy.  Similarly, in order to bill for the proctosigmoidoscopy separately, SACHAKOV further indicated that the proctosigmoidoscopy was distinct and independent from the office visit and the hemorrhoidectomy.

        44.  On or about June 29, 2010, patient E.Y. was interviewed by law enforcement officials.  E.Y. indicated that E.Y. saw SACHAKOV because he/she was experiencing some rectal bleeding.  E.Y. stated that SACHAKOV's examination lasted approximately 2 minutes.  Afterwards, SACHAKOV performed an anoscopy, told E.Y. that the condition was minor and required no further treatment, and then prescribed E.Y. an ointment. Afterwards, E.Y. received correspondence from Emblem which indicated that SACHAKOV submitted claims for an office visit,

proctosigmoidoscopy, and a hemorrhoidectomy.  E.Y. knows the

difference between an anoscopy and a proctosigmoidoscopy because

E.Y. is a registered nurse.  E.Y. also stated that he/she

underwent a hemorrhoidectomy in the past at a different medical

facility, and that the previous procedure lasted approximately 40

minutes although E.Y. was at the hospital for approximately five

hours, and that it took E.Y. three days before he/she could walk

unassisted.  E.Y. called SACHAKOV's office to complain because

he/she did not receive a proctosigmoidoscopy or a

hemorrhoidectomy.  E.Y. was informed that the purpose of the

over-billing was to ensure that the insurance carrier would pay

the proper amount given that the insurance carrier usually did

not cover the actual claims.


Patient L.F.

         45.  SACHAKOV submitted a reimbursement claim for

patient L.F. indicating that, on September 9, 2009, he performed

an office visit, an anoscopy, a hemorrhoidectomy and a procedure

for the destruction of anal lesions for L.F. who was then covered

by Fidelis.  If they occurred, the office visit, anoscopy, and

the destruction of lesions should have been covered in the global

surgical package for the hemorrhoidectomy.  In order to bill for

the office visit separately, SACHAKOV indicated that the office

visit was for a significant, separately identifiable office visit

that was above and beyond what was necessary for the
hemorrhoidectomy.  Similarly, in order to bill for the anoscopy
and the destruction of lesions, SACHAKOV further indicated that
these procedures were distinct and independent from the office
visit and the hemorrhoidectomy.

46.  On or about June 18, 2010, patient L.F. was
interviewed by law enforcement officials.  L.F. indicated that
SACHAKOV performed an examination of L.F.'s rectal area and asked
L.F. whether L.F. wanted surgery.  SACHAKOV described the surgery
and told L.F. that L.F. would experience discomfort and have
trouble sitting.  L.F. decided not to have any surgery.
Nevertheless, SACHAKOV submitted a claim to Fidelis indicating
that he performed two surgical procedures on L.F. - a
hemorrhoidectomy and the destruction of anal lesions.


Patient D.O.

47.  SACHAKOV submitted a claim for patient D.O.
indicating that on September 9, 2009, SACHAKOV conducted an
office visit and performed a proctosigmoidoscopy and a
hemorrhoidectomy on patient D.O. who was then covered by GHI.
SACHAKOV billed GHI for an office visit which purportedly
involved taking a detailed history, conducting a detailed
examination, and involving a medical decision-making of low
complexity that takes about 40 minutes.  SACHAKOV billed GHI for

a purported proctosigmoidoscopy involving moderate (conscious) sedation.  SACHAKOV billed GHI for a purported hemorrhoidectomy involving the excision of an internal or external hemorrhoid.  If they occurred, the office visit and the proctosigmoidoscopy should have been covered in the global surgical package for the hemorrhoidectomy.  In order to bill for the office visit separately, SACHAKOV indicated that the office visit was for a significant, separately identifiable office visit that was above and beyond what was necessary for the hemorrhoidectomy.  Similarly, in order to bill for the proctosigmoidoscopy separately, SACHAKOV further indicated that the proctosigmoidoscopy was distinct and independent from the office visit and the hemorrhoidectomy.

48.  On or about June 21, 2010, patient D.O. was interviewed by law enforcement officials.  D.O. visited the offices of SACHAKOV only one time in early September 2009.  D.O. was examined by a nurse practitioner, and not SACHAKOV, for approximately five to six minutes during which D.O. indicated that nothing was inserted into D.O.'s anus, and D.O. received no injections of any kind.  The nurse practitioner told D.O. that D.O. had a "fissure," and prescribed D.O. some Benefiber, cocoa butter suppositories and an ointment.  D.O. made an appointment to return in about one month.  Subsequently, someone from CRCNY

called D.O. and told D.O. that CRCNY no longer accepted D.O.'s
insurance carrier, GHI, and asked that D.O. not return to CRCNY.

## Patient I.L.

49.   SACHAKOV submitted a claim for patient I.L.
indicating that on September 2, 2009, SACHAKOV conducted an
office visit and performed a proctosigmoidoscopy and a
hemorrhoidectomy on patient I.L. who was then covered by GHI.
SACHAKOV billed GHI for an office visit purportedly involving
taking a detailed history, conducting a detailed examination, and
involving a medical decision-making of low complexity that takes
about 40 minutes.   SACHAKOV billed GHI for a proctosigmoidoscopy
involving moderate (conscious) sedation.   SACHAKOV billed GHI for
a hemorrhoidectomy involving the excision of an internal or
external hemorrhoid.   If they occurred, the office visit and the
proctosigmoidoscopy should have been covered in the global
surgical package for the hemorrhoidectomy.   In order to bill for
the office visit separately, SACHAKOV indicated that the office
visit was for a significant, separately identifiable office visit
that was above and beyond what was necessary for the
hemorrhoidectomy.   Similarly, in order to bill for the
proctosigmoidoscopy separately, SACHAKOV further indicated that
the proctosigmoidoscopy was distinct and independent from the
office visit and the hemorrhoidectomy.

50.   On or about June 24, 2010, patient I.L. was
interviewed by law enforcement officials.   I.L. visited the
offices of SACHAKOV only one time in early September 2009.   I.L.
stated that he/she never saw SACHAKOV during I.L.'s sole visit to
CRCNY.   Instead, someone with a different first name examined
I.L. along with another man in a blue nurse's outfit.   I.L.
stated that I.L. was not touched in his/her rectal area during
the examination.   Afterwards, the examiner told I.L. that I.L.
had a small hemorrhoid, prescribed I.L. a cream, and advised I.L.
to make a new appointment if the problem persisted.   I.L. stated
that the examination lasted approximately five to six minutes.

### BUSINESS RECORDS

51.   Based on my knowledge, training and experience,
and the experience of other law enforcement officers, I have
knowledge of common business practices.   In particular, I am
aware that businesses, particularly medical practices, routinely
document and maintain records of their operating accounts - both
in hard copy and electronically - including the receipt,
expenditure and accounting of business funds.   Businesses also
maintain detailed records of their business activities, including
with respect to vendors, customers, lenders and employees.   As
such, there is probable cause to believe that there will be
located at the SUBJECT PREMISES business records documenting

interactions and communications between Boris Sachakov, Michael Sachakov, and others involved in the fraudulent scheme.

52.   Based on my knowledge, training, and experience, businesses billing Medicare also routinely maintain records of patient files, bills, invoices, and claims for reimbursements for services billed, provided, or alleged to have been provided. Documents include reimbursement claim forms, explanations of medical benefits, detailed written orders or prescriptions, certificates of medical necessity, information from the treating physician concerning the patients' diagnosis, proof of delivery of services and/or items that were submitted by any representative acting on behalf of CRCNY or for reimbursement by the Benefit Programs.  In fact, during an unannounced inspection of CRCNY at the SUBJECT PREMISES that took place on or about October 22, 2009, Medicare investigators obtained copies of approximately 138 patient charts from CRCNY.

53.   Based on my knowledge, training, and experience, businesses billing the Benefit Programs also retain contracts, agreements, papers, and affiliated records pertaining to providing of medical services, including manufacturer catalogs, purchase orders, invoices, and receipts.

54.   Based on my knowledge, training, and experience, businesses billing the Benefit Programs also retain letters relating to efforts to collect co-payments and deductibles from

individuals that receive health care coverage from the Benefit Programs. In addition, businesses retain correspondence and cancelled checks relating to notice of overpayment and request for refunds from the Benefit Programs. Businesses billing the Benefit Programs also have correspondence to and from the Benefit Programs including, but not limited to, manuals, advisories, newsletters, bulletins, and publications. Businesses also retain correspondence to and from patients regarding the Benefit Programs.

55. Based on my knowledge, training, and experience, the financial books and records and documents constituting bank accounts, money market accounts, checking accounts, investment accounts, stock fund accounts, 401K funds, mutual funds, retirement funds, bonds, or bund funds, including deposits and disbursements, cancelled checks or draft electronic transfers, ledgers, credit card, ATM, and debit card accounts are also retained by businesses.

56. Based on my knowledge, training, and experience, contracts, agreements, logs, lists or papers affiliated with any medical professional services, referrals, or storage including records of payment are also retained by businesses.

57. Based on my knowledge, training, and experience, medical clinics retain records of employees, including files listing any and all employee names addresses, telephone numbers,

and background information for all current and former employees, which are relevant.

58. Based on my knowledge, training, and experience, medical clinics often hire outside medical insurance billing companies. Therefore, all contracts, agreements, or paper affiliated with these companies are relevant.

### SPECIFICS REGARDING THE SEIZURE AND SEARCHING OF COMPUTER SYSTEMS FOUND ON THE TARGET PREMISES

59. Based on the investigation conducted by agents in this case, there is at least one personal computer inside the SUBJECT PREMISES. Based on my training and experience, businesses often store documents on their computers that are relevant to a fraud investigation. These documents include business plans, correspondence, spreadsheets of expenses and revenue, invoices, and meeting minutes, among other things. There is probable cause to believe that the computer or computers at CRCNY contain documents related to the fraud scheme.

60. Based upon my training and experience and information related to me by agents and others involved in the forensic examination of computers, I know that computer data can be stored on a variety of systems and storage devices including hard disk drives, floppy disks, compact disks, magnetic tapes, memory chips and other portable and removable media. I also know that during the search of the premises it is not always possible

to search computer equipment and storage devices for data for a
number of reasons, including the following:

a.  Searching computer systems is a highly
technical process which requires specific expertise and
specialized equipment.  There are so many types of computer
hardware and software in use today that it is impossible to bring
to the search site all of the necessary technical manuals and
specialized equipment necessary to conduct a thorough search.  In
addition, it may also be necessary to consult with computer
personnel who have specific expertise in the type of computer,
software application or operating system that is being searched.

b.  Searching computer systems requires the use
of precise, scientific procedures which are designed to maintain
the integrity of the evidence and to recover "hidden," erased,
compressed, encrypted or password-protected data.  Computer
hardware and storage devices may contain "booby traps" that
destroy or alter data if certain procedures are not scrupulously
followed.  Since computer data is particularly vulnerable to
inadvertent or intentional modification or destruction, a
controlled environment, such as a law enforcement laboratory, is
essential to conducting a complete and accurate analysis of the
equipment and storage devices from which the data will be
extracted.

c. The volume of data stored on many computer systems and storage devices will typically be so large that it will be highly impractical to search for data during the execution of the physical search of a premises. A single megabyte of storage space is the equivalent of 500 double-spaced pages of text. A single gigabyte of storage space, or 1,000 megabytes, is the equivalent of 500,000 double-spaced pages of text. Storage devices capable of storing 160 gigabytes ("GB") of data are now commonplace in desktop computers. Consequently, each non-networked, desktop computer found during a search can easily contain the equivalent of 80 million pages of data, which, if printed out, would result in a stack of paper over four miles high.

d. Computer users can attempt to conceal data within computer equipment and storage devices through a number of methods, including the use of innocuous or misleading filenames and extensions. For example, files with the extension ".jpg" often are image files; however, a user can easily change the extension to ".txt" to conceal the image and make it appear that the file contains text. Computer users can also attempt to conceal data by using encryption, which means that a password or device is necessary to decrypt the data into readable form. In addition, computer users can conceal data within another seemingly unrelated and innocuous file in a process called

"steganography." For example, by using steganography a computer
user can conceal text in an image file which cannot be viewed
when the image file is opened.  Therefore, a substantial amount
of time is necessary to extract and sort through data that is
concealed or encrypted to determine whether it is evidence,
contraband or instrumentalities of a crime.

       e.  Computer files or remnants of such files can
be recovered months or even years after they have been downloaded
onto a hard drive, deleted, or viewed via the Internet.
Electronic files downloaded to a hard drive can be stored for
years at little to no cost.  Even when such files have been
deleted, they can be recovered months or years later using
readily-available forensic tools.  When a person "deletes" a file
on a home computer, the data contained in the file does not
actually disappear; rather, that data remains on the hard drive
until it is overwritten by new data.  Therefore, deleted files,
or remnants of deleted files, may reside in free space or slack
space - that is, in space on the hard drive that is not allocated
to an active file or that is unused after a file has been
allocated to a set block of storage space - for long periods of
time before they are overwritten.  In addition, a computer's
operating system may also keep a record of deleted data in a
"swap" or "recovery" file.  Similarly, files that have been
viewed via the Internet are automatically downloaded into a

temporary Internet directory or cache. The browser typically maintains a fixed amount of hard drive space devoted to these files, and the files are only overwritten as they are replaced with more recently viewed Internet pages. Thus, the ability to retrieve residue of an electronic file from a hard drive depends less on when the file was downloaded or viewed than on a particular user's operating system, storage capacity, and computer habits.

61. In light of these concerns, I hereby request the Court's permission to search, copy, image and seize the computer hardware (and associated peripherals) that are believed to contain some or all of the evidence described in the warrant, and to conduct an off-site search of the image or hardware for the evidence, fruits and instrumentalities of violations of the Specified Federal Offenses.

## THE APPLICATION FOR A SEARCH WARRANT

62.  Based on all of the foregoing facts, there is probable cause to believe that a search of the SUBJECT PREMISES will lead to the discovery of the items outlined above (described more fully in Attachment B, incorporated by reference herein), which items constitute evidence, fruits, and/or instrumentalities of violations and attempted violations of, and conspiracies to violate, _inter alia_, the Specified Federal Offenses.

WHEREFORE, deponent prays that a warrant be issued, pursuant to Rule 41 of the Federal Rules of Criminal Procedure, to search the SUBJECT PREMISES for the items and information set forth in Attachment B.

## CONCLUSION

63.  Based on the above information, there is probable cause to believe that the Specified Federal Offenses have been violated.  Accordingly, this Affiant respectfully requests that this Court issue a search warrant for the SUBJECT PREMISES, more particularly described in Attachment A, authorizing the seizure of the items described in Attachment B, which constitute evidence, contraband, fruits, and other items related to violations of the Specified Federal Offenses.

64.  It is further respectfully requested that this Court issue an Order sealing, until further order of this Court,

33

all papers submitted in support of this Application, including

the Application, Affidavit, and Search Warrant, and the requisite

inventory notice (with the exception of one copy of the warrant

and the inventory notice that will be left at the SUBJECT

PREMISES).  Sealing is necessary because the items and

information to be seized are relevant to an ongoing

investigation, and premature disclosure of the contents of this

Affidavit and related documents may have a negative impact on

this continuing investigation and may jeopardize its

effectiveness.


RONNY AGUILAR
Special Agent
United States Department of
     Health and Human Services
Office of the Inspector General


Sworn to before me this
___ day of September, 2010


HON. STEVEN M. GOLD
UNITED STATES MAGISTRATE JUDGE
EASTERN DISTRICT OF NEW YORK

ATTACHMENT A

DESCRIPTION OF PREMISES TO BE SEARCHED

(COLON AND RECTAL CARE OF NY, P.C., 2955 BRIGHTON 4TH STREET,
BROOKLYN, NEW YORK, FIRST FLOOR, RIGHT HAND ENTRANCE, WITH A SIGN
ABOVE THE DOOR STATING, "PROCTOLOGY CLINIC 718-236-4040")

The SUBJECT PREMISES is located between Brighton 4th

Lane and Oceanview Avenue in Brooklyn, New York.  The SUBJECT

PREMISES is located between 2949 and 2959 Brighton 4th Street.

The SUBJECT PREMISES is a five story tan building, with off white

trim and a stucco surface.  On the left corner of the building is

a solid metal silver colored roll down garage door with a red and

white colored "No Parking" sign affixed above the door.  The

second thru fifth floors appear to be residential with two

balconies for the third floor, two balconies for the fourth floor

and two penthouse apartments on the fifth floor.  The ground

floor entrances are comprised of three pairs of glass doors with

large glass windows on the left and right of the doors.  The

center pair of glass doors has "2955" in black and white color

affixed to one of the doors.  To the right of these doors,

mounted on the door frame, is a bell intercom access box.  This

intercom box lists fourteen apartments, listed as 2A thru 15B.

Upon entry through the center pair of doors is lobby access to

the above apartments with mail boxes located to the right, an

elevator located in the center and two set of stairs located at

the rear past the elevator on the right and left side of the

lobby.  The set of stairs on the left lead upward and downward,
with a closed door on the left apparently leading to the ground
floor establishment.  The set of stairs on the right are
identical to the ones located on the left, again also with a
closed door apparently leading to the ground floor establishment.
The pair of glass doors located on the right has the number
"2955" in black and white color affixed to a stucco surface
portion between the doors and a large window.  Above the right
entrance and window of the building are blue lettering and
numerals that read "Proctology Clinic 718-236-4040" with a peach
emblem replacing the middle "o" in proctology.  Upon entering the
pair of glass doors on the right leading to the proctology
clinic, one enters a waiting area with numerous chairs and a
reception desk towards the left.  When standing directly in front
of the reception desk, there are numerous file folders located
all along the right wall beginning from the desk and continuing
towards the back.  On the left of the reception desk is a closed
door, presumably leading towards the exam rooms and other areas
of the medical office.  To the left of that door is another door
leading to a bathroom.  The pair of glass doors located on the
left has the number "2955" in black and white color affixed to a
stucco surface portion between the doors and a large window.
Above the left entrance and window of the building is blue
lettering that reads "Medical Office."  Upon entering the pair of

glass doors on the left is a much smaller area than previously described with approximately three chairs.  There is a desk that is fully enclosed with a window and a closed glass door towards the right.  Numerous file folders are along the left wall, beginning from behind the desk enclosure and continuing back. There are no side or rear access to the SUBJECT PREMISES.

## ATTACHMENT B

### ITEMS TO BE SEIZED

Unless otherwise specified, any and all of the following named records, documents, items, and information concerning the following:  Colon and Rectal Care of NY, P.C. ("CRCNY"), for the period April 2003, through the date of the execution of the search warrant in this matter.  This information may be stored or filed and includes any format in which the information may exist:

1.   Documents constituting, concerning, or relating to patient files, bills, invoices, and claims for reimbursement for services billed, provided, or alleged to have been provided to patients to include but not limited to reimbursement claim forms (HCFA/CMS 1500), explanations of medical benefits, dispensing orders, detailed written orders or prescriptions, certificates of medical necessity, information from the treating physician concerning the patients' diagnosis, and proof of delivery of services and/or items that were submitted by any representative acting on behalf of CRCNY or for reimbursement by the Benefit Programs.

2.    All contracts, agreements, papers, and affiliated records constituting, concerning, or relating to providing of medical services and/or items by CRCNY, Boris Sachakov, or any employee or representative acting on behalf or CRCNY or Boris

Sachakov, to include, but not limited to manufacturer catalogs,
purchase orders, invoices, and receipts.

3.  All letters constituting, concerning, or relating
to efforts to collect co-payments and/or deductibles for
individuals that receive health care coverage from the Benefit
Programs.

4.  All correspondence and cancelled checks, including
those relating to notice of overpayment and request for refunds,
from the Benefit Programs.

5.  All correspondence to and from the Benefit
Programs including, but not limited to, manuals, advisories,
newsletters, bulletins, and publications.

6.  All correspondence to and from patients regarding
the Benefit Programs.

7.  Financial books and records and documents
constituting, concerning, or relating to Boris Sachakov, Michael
Sachakov, or CRCNY, including, but not limited to:

(a)  Bank Accounts, money market accounts,
checking accounts, investment accounts, stock fund accounts, 401K
funds, mutual funds, retirement funds, bonds or bond fund;
Including deposits and disbursements, cancelled checks or draft
electronic transfers, ledgers, loan statements, loan agreements;
and

(b)  Credit card/ATM/debit card accounts.

8.    All contracts, agreements, logs, lists or papers affiliated with any medical professional services, referrals, or storage for CRCNY, Boris Sachakov, or Michael Sachakov, or any employees or representatives of CRCNY, Boris Sachakov or Michael Sachakov.

9.    All CRCNY employee files and resumes.   This may include but not limited to any handwritten or computer files listing any and all employee names addresses, telephone numbers, and background information for all current and former employees;

10.    All contracts, agreements or paper affiliated with any outside medical insurance billing company for CRCNY, Boris Sachakov, or Michael Sachakov.

11.    Additionally, the items, listed above, which are contained in any computer equipment as follows, and pertain to the above listed persons, business, or entities: *AND THE DATA NECESSARY TO SEARCH FOR THEM* *SMG 9/21/10*

(a)   Computer equipment, including any electronic devices which are capable of collecting, analyzing, creating, displaying, converting, storing, concealing, or transmitting electronic, magnetic, optical, or similar computer impulses or data.   These devices include but are not limited to any data-processing hardware (such as central processing units, memory typewriters, and self-contained "laptop" or "notebook" computers); internal and peripheral storage devices (such as laser disks, fixed disks, external hard disks, floppy

disk drives and diskettes, tape drives and tapes, optical storage
devices, and other memory storage devices); peripheral
input/output devices (such as keyboards, printers, scanners,
plotters, video display monitors, and optical readers); and
related communications devices (such as modems, cables and
connections, recording equipment, RAM or ROM units, acoustic
couplers, automatic dialers, speed dialers, programmable
telephone dialing or signaling devices, and electronic
tone-generating devices); as well as any devices, mechanisms, or
parts that can be used to restrict access to such hardware (such
as physical keys and locks);

(b)  Information, instructions, programs or
program code, stored in the form of electronic, magnetic,
optical, or other media which are capable of being interpreted by
a computer of its related components, data, data fragments or
control characters integral to the operation of computer
software, operating system software, applications software,
utility programs, compilers, interpreters, communications
software, and other programming used or intended for use to
communicate with computer components;

(c)  Any written, recorded, printed or
electronically stored material which explains or illustrates the
configuration or use of any seized hardware, software, or related
item;

records, printing, or typing); any electrical, electronic, or
magnetic form (such as tape recordings, cassettes, compact
discs), or any information on an electronic or magnetic storage
device (such as floppy diskettes, hard disks, CD-ROMs, optical
discs, printer buffers, smart cards, memory calculators,
electronic dialers, Bernoulli drives, or electronic notebooks),as
well as printouts or readouts from any magnetic storage device.

(g) Any and all communications previously
received or transmitted, or prepared in contemplation of
transmission, including electronic mail or data associated with
electronic bulletin board systems, stored on any of the
electronic media named above.  All electronic communications,
including those previously received or transmitted, or held in
temporary, intermediate storage incident to transmission,
documents, and materials, including those used to facilitate
communications, as used above shall include any and all
communications previously received, transmitted, or stored, or
prepared in contemplation of transmission, including electronic
mail or data associated with electronic bulletin board systems,
whether stored on any of the electronic media named above or held
in temporary, intermediate storage incident to transmission to
the individuals or premises within the scope of this application.

(h)     Any and all electronic information or electronic data, stored in any form, which is used or has been prepared for use either for periodic or random back-up (whether deliberate or inadvertent, or automatically or manually initiated), or any computer or computer system, floppy diskettes, fixed hard disks, removable hard disk cartridges, tapes, laser disks, videocassettes, and other media capable or storing magnetic or optical coding.

(i)     Such electronic data in the form of electronic records, documents, and materials, including those used to facilitate communication;

(j)     "Hidden", erased, compressed, password-protected, or encrypted files;

(k)     "Mainframe" computers, or of "micro" or "personal"computers, either standing alone or joined through a series of connected computers called a "network";

(l)     All magnetic storage devices as well as the central processing units (CPUs) and applicable keyboards and monitors which are an integral part of the processing unit; and

(m)     Various file "directories" and the individual files they contain, recently deleted data; scanning storage areas for deliberately hidden files; all of which constitute evidence, fruits and instrumentalities of violations and attempted violations of, and conspiracies to violate, inter alia, Title 18,

United States Code, Section 1347 (Health Care Fraud); Title 18,

United States Code, Section 1349 (Health Care Fraud Conspiracy);

Title 18, United States Code, Section 1028A (Aggravated Identity

Theft).